# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

TERRENCE JOSEPH CARPENTER,      :
     Plaintiff,                   :
                                    :
       v.                       :     C.A. No. 15-324ML
                                    :
CAROLYN W. COLVIN, ACTING      :
COMMISSIONER OF SOCIAL SECURITY,  :
     Defendant.            :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff Terrence Joseph Carpenter alleges that he is disabled because of pain in his lower back, caused by disc degeneration, and in his left knee, on which he has had arthroscopic surgery as many as five times. After filing his disability application, he added mental impairments (depression and explosive disorder) to the reasons that he claims he cannot work. His administrative appeal is before the Court on a motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") under 42 U.S.C. § 405(g) of the Social Security Act (the "Act"). Plaintiff contends that the Administrative Law Judge ("ALJ") erred in basing his mental residual functional capacity ("RFC")[1] finding on the opinion of a Social Security Administration ("SSA") psychologist who opined without having reviewed most of the treating records of Plaintiff's psychiatrist and erred further in basing his physical RFC finding on the opinion of an SSA physician who opined without having reviewed subsequent records pertaining to treatment of Plaintiff's knee and feet. Plaintiff also challenges the ALJ's determination to discount Plaintiff's credibility. Defendant

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find that the ALJ's findings are sufficiently supported by substantial evidence and recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 15) be GRANTED.

## I.   Background Facts

### A.   Plaintiff's Background

A high school graduate who loves sports, played high school football and basketball and was a physically active person, Plaintiff was a younger individual, thirty-two, when he stopped working on July 25, 2012, after he slipped while cleaning a whirl-pool at Healthtrax, the health club where he had been employed as the maintenance director for five years.  Tr. 39, 54, 66, 197, 269.  As a result of the fall, Plaintiff tore the meniscus in his left knee, on which he had already had between two and four arthroscopic procedures;[2] following the fall, in August 2012, he had another arthroscopic procedure.  Plaintiff's knee pain is complicated by obesity and by pre-existing lumbar spine pain caused by disc degeneration.  Tr. 17, 17 n.1, 258.  During the period under review, Plaintiff was able to drive and lived at times with his father and at times with his girlfriend and their young child – he claims to have done 25% of the household chores, including laundry and shopping, and to have assisted with the care of the child, but the record reflects

---

[2] The record reflects a total of three arthroscopic surgeries on the left knee, in 2003, 2011 and 2012.  Tr. 219, 310, 348.  There are also several references in connection with his application to Plaintiff having had a total of five such surgeries.  Tr. 66, 77, 252.  Whatever the correct number, it appears plain that Plaintiff's left knee issues are longstanding and, as the ALJ found, severe.

friction (leading to separations) with his girlfriend over whether he was doing as much as he could and because "I'm always throwing things or screaming or yelling."  Tr. 20, 37-38, 50-52, 57-58, 194-96, 330.

Plaintiff alleges that, for most of his life, he has had problems with dealing with people. Tr. 37, 55-56.  Because of his longstanding pain from the left knee and back, for many years prior to the alleged onset of disability, Plaintiff took opioid-based pain medications and used medical marijuana.  Tr. 45, 192.  Despite his claim that he has been "very angry and [had a] short temper since the pain has been taking over my life," Plaintiff appears to have had no involvement with the criminal justice system; as he wrote in his Function Report, he had "never been in trouble much."  Tr. 198-99.

**B.      Physical Medical Evidence**

During the years prior to onset, Plaintiff endured pain in his left knee and back for which he had repeated arthroscopic knee surgeries and injections and was prescribed an array of powerful pain medications.  See generally Tr. 219-41, 250-56, 297-320.  Consistently, in a pain questionnaire filed with his application, Plaintiff stated that the pain in his back and knee started in 2004 and that he had taken Oxycodone for at least five years.  Tr. 191-92.  A 2011 MRI confirmed the diagnosis of degenerative disc disease in Plaintiff's lower spine.  Tr. 234. Throughout these years of pain, Plaintiff was treated at Medical Group of Rhode Island by rheumatologist, Dr. Edward Reardon, at West Bay Orthopedics and at the Garden City Treatment Center.  Tr. 223-33, 240-41, 250-56, 297-320.  Dr. Reardon summarized Plaintiff's many pre-onset difficulties in 2011:

> This is a very unfortunate 32-year-old white male who . . . has had a long history
> of chronic pain, but worsened over the past year.  He has pain in the left knee. . . .
> His lower back pain is in the lumbar region. . . . Complicating thing[s] is he has
> had four knee arthroscopic surgeries. . . . System review was conducted including

> fatigue, headache, arm[] and leg weakness, depression, irritability, mood changes, tension, trouble concentrating, joint stiffness, joint swelling and shortness of breath with exertion.

Tr. 252.  Despite this assessment, Dr. Reardon did not recommend that Plaintiff stop working, nor did he suggest mental health treatment.  And despite the pain and other issues, throughout this period, Plaintiff worked full time.  From 2002 to 2005, he worked as a laborer at the zoo, and from 2005 to 2006, he worked as a waiter at the Alpine Country Club, but was fired after he punched a door at work and broke his hand.  Tr. 170, 199.  However, after that incident, he went on to work successfully for more than five years at Healthtrax, a job that required him to carry weights, climb ladders, repair equipment and order supplies, which was described by the vocational expert as skilled work at the medium exertional level.  Tr. 59, 171.

Plaintiff's July 2012 fall at work resulted in a worker's compensation claim, arthroscopic surgery and physical therapy.  Tr. 235-39, 244-48, 257-66.  Within less than four months, Plaintiff was cleared by his orthopedic surgeon, Dr. Paul Fadale, to return to sedentary/light duty work; however, Plaintiff expressed fear that he was not sure he could return to the physically active work he used to do.  Tr. 280, 362.  Following that recommendation, Plaintiff made new complaints of knee pain and was taken out of work again so that the new pain could be investigated by a new MRI.  Tr. 279.  When the left knee MRI came back showing no meniscal tear, Tr. 277, Dr. Fadale referred Plaintiff for injections, opined that he could perform "sedentary activity as tolerated" and encouraged Plaintiff to consider job retraining.  Tr. 278-79.  Contemporaneous therapy notes confirm that Plaintiff's physician discussed the need to accept job retraining; the therapist noted that Plaintiff was mourning the loss of his physical lifestyle.  Tr. 329.  Consistent with the recommendation to explore viable work opportunities in light of his functional limitations, in March 2013, Plaintiff made an attempt "to work for MetLife through

4

[a] contract"; this effort failed not because of his limitations but rather because "his typing [was] too slow." Tr. 324.

In September 2013, the Donley Center staff confirmed that they were not optimistic that Plaintiff would be able to return to his prior work. Tr. 362. Functional testing resulted in the finding that he "briefly demonstrated activities in the Sedentary-Light category before subjectively report of knee pain precluded additional testing"; ultimately, the October 2013, the Donley Center's evaluation concluded that Plaintiff's limitations in the ability to sit, walk, stand, bend and stoop frequently and to crouch, kneel or climb stairs occasionally precluded his prior work but would permit him to return to a job whose demands met these limitations. Tr. 367-69. Based on these determinations, Plaintiff spoke with staff about "determining what type of work he can steadily perform now." Tr. 367. During the same period, Plaintiff continued to see orthopedist Dr. Randall Updegrove for knee pain and rheumatologist Dr. Reardon for back pain and trigger point injections. Tr. 354, 356. Plaintiff also consulted with neurologist, Dr. Gary L'Europa. Tr. 351-53. In November 2013, Plaintiff visited the Kent Hospital Emergency Room because his knee locked; the attending physician found the knee to be stable and the soft tissue "unremarkable." Tr. 371-73.

The medical records pertaining to Plaintiff's left knee and lumbar spine are clear that both are severely impaired, particularly the knee. However, not one of the many treating providers submitted an opinion in connection with Plaintiff's disability application that found work-preclusive limitations. Rather, these records clearly reflect temporary work stoppages in connection with acute medical incidents (such as the July 2012 fall) and functional limitations precluding Plaintiff's prior work. They do not reflect the inability to perform all work.

### C.    Mental Health Medical Evidence

During the years prior to filing his disability application, while he was working, Plaintiff complained to Dr. Reardon of depression, irritability, mood changes, tension, trouble concentrating, irritability and depression.  Tr. 252.  However, as far as the record reveals, no treating provider ever recommended mental health treatment and Plaintiff never sought or received mental health treatment.  Despite his claim of having been fired in 2006 because he lost his temper, he continued working for five more years; moreover, there is no evidence of criminal involvement arising from an explosive temper.  When Plaintiff applied for DIB in September 2012, his application did not refer to any mental health impairments.

This changed a month after he filed his application.  On October 5, 2012, Plaintiff had his first contact with a mental health provider when he was evaluated by a psychiatrist, Dr. Henry Mann of the Quality Behavioral Health Center.  Tr. 269-73.  Dr. Mann's report does not indicate the referral source, stating only that Plaintiff came to him because he was "miserable" and depressed because of pain so severe that it is only masked by oxycodone and medical marijuana and that has caused him to become irritable and explosive.  Tr. 269.  Dr. Mann diagnosed depressive disorder, secondary to pain and the inability to work, and assessed a Global Assessment of Functioning ("GAF") score of 38.[3]  Inconsistently with the balance of the medical record, the report notes that Plaintiff's depression and anger, together with the "pertinent psychosocial stressors" causing them, had only begun a year prior.  Tr. 269-70.  Dr. Mann noted no deficits of attention, no hyperactivity or impulsivity, no anxiety, no obsessions, a few peer

---

[3] A Global Assessment of Functioning ("GAF") score of 38 is at the high end of the range that indicates major functional impairment, delusions, hallucinations or impaired reality testing.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR").  The most recent update of the DSM has eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM-5")).  Nevertheless, adjudicators may continue to receive and consider GAF scores.  SSA Admin. Message 13066 at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (last visited Sept. 30, 2016).

relationships, normal sibling relationships, no history of physical or sexual abuse, no substance abuse and no psychiatric history either for Plaintiff or for his parents or siblings.  Tr. 270-71.  On mental status examination, Dr. Mann observed that Plaintiff was depressed, had a hopeless mood, reported disrupted sleep, low energy and decreased pleasure in life, including no sex drive.  Tr. 271.  Otherwise he found Plaintiff to be a hard worker, cooperative, highly motivated to feel better and exhibiting no occupational problems.  Tr. 270-72.

A month later, Plaintiff had the first of four treating appointments with Dr. Mann.[4]  Tr. 322, 323, 326, 330.  At the November 7, 2012, appointment, Dr. Mann noted Plaintiff's subjective report of relationship difficulties with his girlfriend, pain and "hair trigger temper at times"; on objective examination, Dr. Mann noted that Plaintiff was "calm and cooperative," resigned and depressed but "somewhat better."  Tr. 330.  Dr. Mann added explosive disorder and migraine headaches to his prior diagnosis of depressive disorder secondary to pain and ability to work.  Id.  At the December (possibly January)[5] appointment, Dr. Mann's notes reflect subjective reports of fewer and less intense headaches and fewer negative moods, but a "bad Christmas because of his temper" and pain.  Tr. 326.  His objective observations were the same except that Plaintiff showed "little change."  Id.  He added hypertension, rule out mood disorder and rule out Lyme disease to the list of diagnoses.  Id.  In March 2013, Dr. Mann noted subjective reports of pain and anger and made objective observations of calm and cooperative demeanor; otherwise, his note is identical to the prior appointment.  Tr. 323.  At the final appointment, probably in April 2013, Dr. Mann noted "some improvement" with depression and

[4] As far as the record reveals, treatment with Dr. Mann ended in April 2013, shortly before the application was denied on reconsideration.  Dr. Mann's last treating note is dated March 21, 2013, Tr. 322, but the ALJ's opinion states, and the parties do not disagree, that this appointment was actually in April 2013.  Tr. 21.

[5] This single page note appears to reflect a single appointment but bears two dates, December 7, 2012, and January 25, 2013.  Tr. 326.

that prescription medicine was helping with anxiety.  Tr. 322.  The objective observations remain

the same:  "Calm and cooperative.  And resigned.  And depressed."  Id.  As far as the record

tells, after that appointment, Plaintiff did not see Dr. Mann again.

At the same time that he was seeing Dr. Mann, between November 2012 and April 2013,

Plaintiff had six therapy sessions with a counselor, Cynthia J. Bearse.  Tr. 321, 324-25, 327-29.

During these sessions, Ms. Bearse recorded that Plaintiff's mood was consistently either a four or

a five out of ten.  Id.  The therapy focused on his pain, his frustration with his inability to engage

in activities he used to enjoy like golf and his efforts to do "sit-down work" or pursue job

retraining as suggested by his physician.  Tr. 324, 325, 327; see Tr. 329 ("Ct seems to be

mourning loss of physical lifestyle.").

Despite Plaintiff's subjective description of his explosive temper, SSA staff and treating

providers who recorded an observation of his demeanor consistently noted that he was pleasant,

calm and cooperative.  Tr. 179 (SSA Field Office reports notes "Clmt was pleasant"); Tr. 294

(Dr. Updegrove observes Plaintiff is "pleasant"); Tr. 351 (Dr. L'Europa records that Plaintiff is

"alert and pleasant"); Tr. 367 (Donley Center staff record that Plaintiff is "pleasant" and

"cooperative"); Tr. 369 (Donley Center staff record that Plaintiff is "pleasant, cooperative"); Tr.

323, 326, 330 (Dr. Mann repeatedly records that Plaintiff is "calm and cooperative").

D.     **Opinion Evidence**

Based on a November 2012 SSA review of the record, including review of Dr. Mann's

October 2012 evaluation, psychologist Dr. Jan Jacobson found that Plaintiff suffered from severe

affective disorder.  Noting that Plaintiff stopped working for physical, not mental reasons, and

that he had no history of mental health treatment until he saw Dr. Mann, Dr. Jacobson opined

that Plaintiff is limited to understanding only simple to moderately detailed instructions for

8

simple tasks in a routine work setting, with the ability to sustain attention for extended periods of two-hour segments in an eight-hour day, and limited to dealing only occasionally with the public. Tr. 71-72.  In December 2012, SSA reviewing physician Dr. Meghana Karande found that fibromyalgia was not established but that Plaintiff had severe physical limitations based on the left knee and the lumbar spine; she concluded that these left Plaintiff with the ability to lift up to twenty pounds and to sit, stand or walk for six out of eight hours.  Tr. 69-70.

In April 2013, SSA reviewing psychologist Dr. Clifford Gordon made the same findings as Dr. Jacobson, finding Plaintiff capable of understanding simple to moderately detailed instructions for simple tasks in a routine work setting with the ability to deal with the public only occasionally.  Tr. 87-88.  In May 2013, focusing on Plaintiff's serious and continuing knee pain, SSA physician Dr. Yousef Georgy found Plaintiff to be more limited than Dr. Karande's RFC reflects; he opined that Plaintiff is capable of working only at the sedentary exertional level.  Tr. 85-86.

## II.    Travel of the Case

On September 11, 2012, Plaintiff filed a DIB application alleging disability commencing on July 25, 2012, based on fibromyalgia, sciatica, degenerative disc disease, degenerative arthritis, absent lateral meniscus and five knee surgeries.  Tr. 63, 71.  Plaintiff's claim was denied initially on December 14, 2012, and on reconsideration on May 29, 2013.  Tr. 14.  At a hearing held on December 3, 2012, Plaintiff (represented by counsel) and a vocational expert ("VE") testified.  Tr. 32, 36-57.  The ALJ's decision finding Plaintiff not disabled issued on January 23, 2014.  Tr. 14-24.  The Appeals Council declined review, making the ALJ's decision the final decision of them Commissioner for purposes of judicial review.  Tr. 1-4.

## III.    Issues Presented

Plaintiff's motion for reversal rests on two arguments – that the ALJ erred in arriving at his RFC findings without adequate support from a medical source[6] and that he erred in his evaluation of Plaintiff's credibility.

## IV.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148,

---

[6] Plaintiff's brief somewhat confusingly argues that only the mental RFC is challenged, but also includes discussion of issues with the physical RFC.  I have considered both.

153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 404.1529(a).

      The Court must reverse the ALJ's decision on plenary review, if the ALJ applies

incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that

the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam);

accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and

the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart,

276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

      The Court may remand a case to the Commissioner for a rehearing under Sentence Four

of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.

Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

      To remand under Sentence Four, the Court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied

the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but

also was insufficient for district court to find claimant disabled).  Where the Court cannot discern

the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow

an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir.

2001).  On remand under Sentence Four, the ALJ should review the case on a complete record,

including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).  With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand.  Id.

## V.    **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    **Treating Physicians**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  <u>See</u> 20 C.F.R. § 404.1527(c)(2).

### B.    Pain

"Pain can constitute a significant non-exertional impairment."  <u>Nguyen</u>, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> 4. Treatment, other than medication, for relief of pain;
>
> 5. Functional restrictions; and
>
> 6. The claimant's daily activities.

<u>Avery</u>, 797 F.2d at 29; <u>Gullon v. Astrue</u>, No. 11-cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I. Nov. 30, 2011).  An individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

C.       **Evaluation of Subjective Symptoms**

When an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence.  See Frustaglia, 829 F.2d at 195.  The lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence so that the credibility determination is determinative, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

Guidance in evaluating the claimant's statements regarding the intensity, persistence, and limiting effects of subjective symptoms is provided by the Commissioner's 2016 ruling, which superseded SSR 96-7p.[7]  SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  In considering the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ must consider the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.  Id. at *4.  The ALJ must also consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.  Id.

---

[7] At the time the ALJ conducted a hearing and issued his decision, SSR 96-7p controlled as the effective date for SSR 16-3p is March 16, 2016.  There are no material differences between the two rulings for the purposes of this case.

VI.     **Application and Analysis**

A.      **The ALJ's Mental and Physical RFC Findings**

The gravamen of Plaintiff's challenge to the ALJ's mental RFC boils down to the

unexplained[8] failure of Dr. Mann's four-page treating record and the related six pages of therapy

notes to make their way into the file reviewed by Dr. Gordon, the SSA psychologist, whose

opinion formed the basis for the ALJ's non-exertional RFC limitations.[9]

Because only Dr. Mann's October 2012 initial evaluation was in the file, Dr. Gordon

never saw the diagnosis of explosive disorder that Dr. Mann added to his list of diagnoses at the

first treating appointment in November 2012; with no medical opinion to support his conclusion,

the ALJ rejected explosive disorder as a severe impairment based on the absence of any "positive

findings on mental status examination" to support the conclusion that explosive disorder had

caused any significant functions limitations.  Tr. 17.  Similarly, Dr. Gordon never saw the

notations in Dr. Mann's January 2013 treating record, which documents Plaintiff's explosion at

Christmas when "I destroyed my whole house and ruined Christmas for everybody."  Tr. 326.

Dr. Gordon also never saw the related therapy record, which mentions Plaintiff's

acknowledgment that he has chased people with his car because they cut him off.  Tr. 329.  And

of course, Dr. Gordon was unaware of Plaintiff's hearing testimony that, "my girlfriend, she

wants to leave half the time because I'm always throwing things or screaming or yelling" or that

he had a longstanding history of difficulties dealing with others and succeeded so well at his job

at the health club only by working at night.  Tr. 56, 58.

---

[8] From the record, it is impossible to ascertain whether the Quality Behavioral Health records from November 2012 to April 2013 were not timely submitted or whether there was an error in incorporating them into the file.

[9] Plaintiff also includes the throwaway argument that the ALJ had no basis for finding that Plaintiff could engage in simple, routine, repetitive tasks.  This limitation is plainly and clearly based on the SSA reviewing psychologist's opinion.  The argument will not be discussed further.

Because the ALJ did not call a medical advisor to fill the gap, Plaintiff argues that he relied only on his lay interpretation of this evidence so that the mental RFC finding is not supported by substantial evidence and the matter must be remanded.  This argument rests on the settled proposition that, "as a lay person . . . [an ALJ is] simply not qualified to interpret raw medical data in functional terms."  Nguyen, 172 F.3d at 35; see Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996); Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 446 (1st Cir. 1991); Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 430 (1st Cir. 1991).  "Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted his own judgment for medical opinion."  Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007); see Hall v. Colvin, 18 F. Supp. 3d 144 (D.R.I. 2014) (remand ordered because ALJ relied on medical opinions not based on entire record, interpreted medical data, and resolved inconsistencies in record, including GAF scores, without assistance from any medical source).

These arguments fail because all of the medical information that formed the basis for Dr. Mann's diagnosis of explosive disorder was well developed in the file that Dr. Gordon reviewed.  The only potentially material information that Dr. Gordon missed is the label of "explosive disorder" itself.  For example, while Dr. Gordon did not see Dr. Mann's add-on diagnosis of explosive disorder, he did review Dr. Mann's October 2012 evaluation, which describes in greater detail than the subsequent treating notes Plaintiff's social isolation.  Tr. 269-70.  The evaluation states that Plaintiff is "just miserable," that his "pain is pervasive," that, "with the pain and ache and current depression and feelings of hopelessness, he is irritable and can be explosive and that these symptoms were the reason why "he is not living with his fiancée at the moment."  Id.  Dr. Gordon also saw Plaintiff's function report in which Plaintiff asserted that his ability to

work is limited by "very bad anger issues" and that "I'm very angry and have short temper since the pain has been taking over my life"; in the report, Plaintiff described his daily activity as "I sit in chair and look at wall" and his being fired from a job because he "punched a door at work instead of [someone's] face broke hand," and that he is "on edge threaten everyone don't care if I die only stay alive for my son." Tr. 193-94, 197-99. And Dr. Gordon saw Dr. Reardon's treating record, in which Dr. Reardon noted that Plaintiff suffers from headache, depression, irritability, mood changes, tension and trouble concentrating. Tr. 252.

Cumulatively, this evidence was more than sufficient to allow Dr. Gordon to carefully consider Plaintiff's "problems with frustration, anger, and social functioning" in forming his opinion. Pl.'s Mem. at 12 (ECF No. 13 at 12). Dr. Mann's application to these symptoms of the label of "explosive disorder" adds nothing new. Far from establishing that Plaintiff was subject to greater limitations than those reflected in the records Dr. Gordon reviewed, Dr. Mann's four pages of treating records reflect the observation at every treating appointment that Plaintiff's depression, anxiety and temper improved with treatment. See Tr. 322 ("depression has some improvement"; "still has some anxiety but feels that the Neurontin is helping"); Tr. 323 ("Temper still an issue; sometimes he gets a valium or Xanax and that helps briefly."); Tr. 326 ("some slight improvement" in mood); Tr. 330 ("sounds depressed but says he is somewhat better").

Under such circumstances, I find no error in the ALJ's reliance on Dr. Gordon's opinion regarding Plaintiff's non-exertional limitations. See Abubakar v. Astrue, Civil Action No. 1:11-cv-10456-DJC, 2012 WL 957623, at *11 (D. Mass. Mar. 21, 2012) (ALJ may rely on reviewing source that did not have access to later records as long as those records do not establish greater limitations); Ferland v. Astrue, No. 11-cv-123-SM, 2011 WL 5199989, *4 (D.N.H. Oct. 31,

2011) ("an ALJ may rely on such an opinion where the medical evidence postdating the reviewer's assessment does not establish any greater limitations . . . or where the medical reports of claimant's treating providers are arguably consistent with . . . the reviewer's assessment").  I also find no error in the ALJ's decision not to call on a medical advisor to assist him in interpreting Dr. Mann's use of the term "explosive disorder."  See Allen v. Colvin, C.A. No. 13-871L, 2015 WL 906000, at *14-15 (D.R.I. Jan. 30, 2015); see also Phan v. Colvin, C.A. No. 13–650L, 2014 WL 5847557, at *11 (D.R.I. Nov. 12, 2014) ("as long as the ALJ relies on substantial evidence for his RFC determination, the argument that he should have called a medical expert is unavailing").

Plaintiff's related argument that it was error for the ALJ to discount Dr. Mann's GAF score of 38 based on his lack of medical expertise may be resolved swiftly.  At the time Dr. Mann made that assessment, he was not yet Plaintiff's treating physician, nor had he had the opportunity to review Plaintiff's medical history as of that date.  See Brown v. Colvin, No. 14-cv-51-PB, 2014 WL 6670637, at *13 (D.N.H. Nov. 24, 2014) ("At the time of his . . . opinion, [the doctor] had only examined [the plaintiff] on one occasion, and therefore his perspective does not have the same value as a 'treating' physician contemplated by the regulations.").  Dr. Mann's factual error in stating that Plaintiff's symptoms were only of one-year's duration confirms that his foundation for making a GAF assessment was limited.  See Allen v. Colvin, No. CA 13-781L, 2015 WL 906000, at *13 (D.R.I. Mar. 3, 2015) ("because [GAF scores] are based on one-time examinations, they are of limited relevance").  In any event, the GAF score was incorporated into Dr. Mann's evaluation, which was among the records examined by Dr. Gordon.  Accordingly, it was not the ALJ who applied a lay interpretation to the GAF assessment, but rather, it was considered by the SSA expert Dr. Gordon.  The ALJ merely noted

his agreement with Dr. Gordon's opinion by pointing to the inconsistency between a GAF of 38 and the absence of any reference by Dr. Mann to abnormalities on objective examination other than "resigned . . . [a]nd depressed." Tr. 322-23, 326, 330. The ALJ's comment on the GAF of 38 does not reflect error.

In addition to his primary argument attacking the ALJ's mental RFC, Plaintiff also contends that Dr. Georgy, the SSA physician, did not see all of the physical health treating materials produced after his file review so that the ALJ's physical RFC is not supported by substantial evidence. However, most of the records that Plaintiff mentions are consistent with the file reviewed by Dr. Georgy, based on which he found that Plaintiff's knee and back were severely impaired and opined that Plaintiff was limited to sedentary work. See Tr. 294-95 (based on increase in knee pain and locking, Dr. Updegrove recommends follow up with Dr. Fadale for evaluation for injections); Tr. 331 (left knee x-ray shows bone-on-bone contact); Tr. 362-67 (Donley Center functional evaluation opines that Plaintiff cannot do prior work but can return to any job whose demands meet specified limitations); Tr. 371 (Kent Hospital record regarding knee locking). For example, Dr. Fadale's final note in September 2013 reflects independent ambulation and minimal stiffness; it contemplates that Plaintiff will return to work based on the work capacity evaluation being done at the Donley Center, which was completed in October 2013, and supported sedentary work. Tr. 362, 367-68. Under this circumstance, where the subsequent records do not reflect a material worsening in Plaintiff's condition, there is no error in the ALJ's reliance on the reviewer's expert opinion. See Harding v. Colvin, Civil Action No. 12-11437-DJC, 2015 WL 8082386, at *12 (D. Mass. Dec. 7, 2015) ("ALJ can rely upon older evidence when the information contained in that evidence remains accurate and where the subsequently added medical evidence does not establish any greater limitations").

In addition to these new records pertaining to Plaintiff's knee, less than a month before reconsideration was denied, Plaintiff was examined by Dr. Gary L'Europa of Neurohealth. Tr. 351-53. Based on nerve conduction studies, Dr. L'Europa diagnosed a potential new impairment, tibial neuropathy consistent with tarsal tunnel syndrome in both feet. Tr. 351-52. However, there is no evidence regarding the severity of this condition nor does the record reflect any treatment arising from this diagnosis. It was mentioned only in passing by Plaintiff's counsel at the hearing; she asked Plaintiff no questions about its impact on him. Tr. 36. Accordingly, there is no evidence on which to base a finding that this new impairment caused or contributed to limitations that can be expected to last more than twelve months.

At bottom, to the extent that Plaintiff's many physical treating sources addressed his ability to work, all appear to concur that he was capable of at least sedentary work. Tr. 227, 278, 367. None opined to work-preclusive limitations. Similarly, Dr. Mann diagnosed various mental health impairments, but also did not opine to work-preclusive limitations. Significantly, faced with the Commissioner's assertion of this core deficit in his claim, ECF No. 15-1 at 7, Plaintiff's reply brief does not dispute this proposition. Based on the foregoing, I find that the ALJ's RFC findings, both mental and physical, were properly supported by substantial evidence – the opinions of the reviewing SSA physician and psychologist at reconsideration – and recommend that they be affirmed.

### B.    Credibility

This is a disability claim based on symptoms caused by objectively verifiable impairments – Plaintiff's seriously impaired left knee and lumbar spine. The opining experts (the SSA psychologist and physician who reviewed the file on reconsideration) on whom the ALJ relied accepted these symptoms, as did the ALJ. It was only the intensity, persistence and

limiting effects of these symptoms as to which the ALJ made the finding that Plaintiff's statements were "not entirely credible." Tr. 20. Plaintiff argues that this determination was error because what Plaintiff claims was the ALJ's only reason – that "unremarkable physical examinations" were inconsistent with his statements – was perfunctory and not adequate.

Plaintiff's argument ignores the ALJ's other reasons for the adverse credibility finding. For example, the ALJ noted that Plaintiff's difficulty with pain from his knee and back so serious as to require treatment with injections and opioid medications had persisted for years, during most of which he was able to work. Tr. 21. Second, the ALJ relied on Plaintiff's testimony about his activities of daily living, including his ability to drive, to do some chores around the house and to provide some care for his young son. Id. Third, the ALJ carefully examined the treating record, which reflects opinions from various providers all concluding that Plaintiff can return to some work, albeit not to his prior work. Tr. 20 (referring to Dr. Fadale's opinion that Plaintiff can return to sedentary work as tolerated, and Donley Center conclusion that Plaintiff can lift up to forty pounds and ambulate slowly, with ability to work limited to walking, sitting and standing occasionally). Finally, Plaintiff misstates the only reason on which he focused – the ALJ did not assert that Plaintiff had had "unremarkable physical examinations." Rather, the ALJ correctly noted that Plaintiff's physical examinations reflected episodic lumbar spasm, left knee tenderness and intermittently antalgic gait complicated by obesity; it is only "aside from" all those abnormalities, that the ALJ found Plaintiff's physical examinations were to be "largely unremarkable." Id.

I find no error in the ALJ's credibility finding. He gave good reasons that are grounded in the substantial evidence of record. Mindful that "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record

evidence," <u>Cruz v. Astrue</u>, C.A. No. 11-638M, 2013 WL 795063, at *16 (D.R.I. Feb. 12, 2013) (alterations in original), and that the ALJ is the individual "optimally positioned to observe and assess witness credibility," <u>Mariano v. Colvin</u>, C.A. No. 15-018ML, 2015 WL 9699657, at *10 (D.R.I. Dec. 9, 2015), I recommend that this Court affirm.

## VII.   <u>Conclusion</u>

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 15) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
September 30, 2016